# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| THE ESTATE OF WILLIAM DONALD SELANDER, by and through his Personal Representative/Administrator, EILEEN SELANDER, individually and as surviving spouse and Personal Representative, | No. 57322-9-II |
| Appellants, | |
| v. | |
| PIERCE COUNTY, a governmental entity and corporation under the laws of the State of Washington; THE PIERCE COUNTY SHERIFF'S OFFICE, an agency of Pierce County; PIERCE COUNTY DEPUTY SHERIFF, JASON BRAY, individually and as an employee of the Pierce County Sheriff's Office; SETH HUBER, Pierce County Deputy Sheriff, individually and in his capacity as an employee of the Pierce County Sheriff's Office; ANTHONY WASHINGTON, individually; and "Jane/John Does" 1 through 5, | UNPUBLISHED OPINION |
| Respondents. | |

GLASGOW, P.J.—Anthony Washington was speeding in an area with a 35-mile-per-hour speed limit when two Pierce County deputy sheriffs began following him. The deputies, Seth Huber and Anthony Bray, followed Washington into a parking lot. When Washington left the parking lot and accelerated to 70 miles per hour, the deputies activated their police car's lights and pursued him. Washington then ran a red light and collided with William Selander, who was

severely injured and later passed away from his injuries. A total of about 45 seconds elapsed between the deputies activating their emergency lights and the collision.

In 2019, Selander sued Washington, the deputies, and Pierce County for negligence. After Selander died, his estate became a party and added a claim for wrongful death. After a bench trial, the trial court dismissed the claims against the deputies and Pierce County. The trial court concluded that Washington intentionally engaged in tortious conduct and that he was 100 percent liable for Selander's injuries.

Selander's estate appeals. It argues that the deputies breached their duties under RCW 46.61.035, a statute addressing police pursuits; that the deputies' breach was a concurrent proximate cause of Selander's death; and that Washington's tortious conduct was not intentional. The estate also challenges findings of fact supporting these conclusions, arguing that they are not supported by substantial evidence.

We affirm. We hold that the trial court did not err because the trial court's findings support its conclusion that the deputies did not breach their duties under RCW 46.61.035. The trial court's findings relevant to this conclusion are supported by substantial evidence. Because we affirm on this basis, we need not reach the other issues that the estate raises.

FACTS

I. BACKGROUND

In 2017, Deputies Huber and Bray saw Washington driving a Honda northbound on Hosmer Street in Tacoma.[1] The deputies thought Washington was speeding, so they did a U-turn

---

[1] Although the incident occurred on South Hosmer Street, the parties and the trial court generally abbreviate the street names at issue by omitting "South." We do so as well.

and followed him. The deputies continued to follow Washington into a horseshoe-shaped laundromat parking lot around 87th Street. After Washington entered the parking lot through the north entrance, he exited through the south entrance and drove back onto Hosmer Street, this time going southbound.

Washington accelerated as he drove south, passing cars using the turn lane and reaching a speed of about 70 miles per hour. The deputies activated their unmarked police car's emergency lights and pursued Washington, but he continued driving recklessly.

Washington sped down Hosmer Street as it curved and became Steele Street. At the intersection of Steele Street and 96th Street, Washington ran a red light and struck Selander, who was driving lawfully through the intersection. Selander was seriously injured, and he later passed away. The pursuit from the laundromat parking lot to the intersection lasted about 45 seconds.

Washington pleaded guilty to vehicular assault, possession of a stolen vehicle, and attempting to elude a police officer.

## II. LAWSUIT

Selander and his wife sued Washington, as well as Huber and Bray individually and in their official capacities as deputies of Pierce County Sheriff's Office, alleging that their negligence caused Selander's injuries. The Selanders also sued Pierce County, alleging that it was vicariously liable for Huber and Bray's negligence. After Selander died, the estate became a party and the estate added a claim of wrongful death.

3

A.      Bench Trial

1.      The deputies' testimony

At a bench trial on the estate's negligence claims, Huber and Bray testified about the pursuit and collision. Huber was taking a narcotic pain medication when he testified because of a workplace injury. A transcript from Huber's deposition was also admitted as evidence.

Bray testified that he and Huber were patrolling a high-crime area around Hosmer Street at roughly 10:40 a.m., with Huber driving and Bray riding in the passenger seat. Bray said traffic would have generally increased during that time, as it was the checkout time for hotels in the area.

The deputies saw Washington driving a Honda out of the Crossland Motel and heading northbound on Hosmer Street. Bray said that initially, nothing about Washington's car stood out to him other than the fact that it was a Honda leaving a motel, explaining that Hondas are commonly stolen cars. Once the deputies passed the Honda while heading southbound on Hosmer Street, they noticed that Washington was speeding. Bray said Washington was driving about 55 miles per hour, which was 20 miles per hour above the speed limit. The deputies made a U-turn and followed Washington into the laundromat parking lot.

In Bray's police report, which was admitted as evidence, he wrote that when Washington entered the laundromat parking lot, the Honda's rear end slid "almost sideways," and the tires "screeched" as they "struggled to retain traction with the road." Ex. 1, at 7. Huber testified that he saw the Honda's rear end fishtailing. Washington quickly left the parking lot and headed southbound on Hosmer Street without checking for oncoming traffic, almost causing an accident.

4

Huber said when Washington exited, his speed "could easily have been 25 to 30" miles per hour. Ex. 136, at 002891.[2]

Bray said he and Huber drove after Washington, and Huber activated the police car's emergency lights either in the laundromat parking lot or as they exited. Bray made a radio call about the pursuit. When Huber was asked about the factors he considered as he pursued Washington, he said, "Mr. Washington was already driving recklessly, putting the community at risk. Us attempting to catch up to him to hopefully engage and get him to stop did not [add] any more danger." Ex. 136, at 002905.

Washington drove down Hosmer Street at a speed of roughly 70 miles per hour. Huber said Washington drove "a significant amount ahead," and while he and Bray matched Washington's speed, they were unable to close the distance. Ex. 136, at 002898. Huber testified that because of this distance, he did not have an opportunity to see if Washington would yield.

After Huber and Bray passed the curve in the road where Hosmer Street turns into Steele Street, they saw Washington collide with Selander at the intersection of Steele Street and 96th Street. Huber saw Selander "cartwheeling out of the driver's window." Ex. 136, at 002899. Huber and Bray said that the intersection where the collision happened is generally busy. Huber arrested Washington, and law enforcement later determined that Washington had been driving a stolen car.

A Pierce County Sheriff's Office vehicle pursuit report was admitted as evidence. The report provided that 17 seconds elapsed from Bray's radio call to the collision.

---

[2] The contents of exhibit 136 contain several documents which are not all paginated in numeric order. Therefore, we will reference plaintiff's ER 904 pagination in our citation to this exhibit.

2.    Washington's testimony

While Washington did not testify at trial, a video and a transcript of his deposition were admitted as evidence.

Washington's testimony about the incident diverged from the deputies' testimony in several respects. He testified that when he first encountered the deputies, he was driving regularly and obeying all traffic laws. He said when the deputies began following him, they accelerated toward him, and he increased his speed "[a] little bit but not by much." Clerk's Papers (CP) at 1705. He said that he turned into the parking lot at under 35 miles per hour and that his vehicle did not slide sideways.

Washington recalled that when the deputies followed him closely in the parking lot, he went "right to panic mode" due to prior run-ins with law enforcement. CP at 1708. He added that someone close to him once broke her leg because a law enforcement officer rear-ended her. He was also afraid because he was under the influence of methamphetamine and was knowingly driving a stolen car.

Washington said that when he drove southbound on Hosmer Street, he kept track of the police car through his rearview and sideview mirrors rather than watching the road. He did not see the red light at the intersection of Steele Street and 96th Street, and he did not see Selander's truck before colliding with it.

Washington testified that after the collision, one of the deputies forcefully stepped on his head. He went in and out of consciousness before waking up in the hospital.

Washington said he believed the deputies had profiled him because he was a young Black man driving a Honda and he had stopped at a motel known for drug trafficking. Washington

asserted that if the deputies had not been pursuing him, there would have been no reason for him to drive as fast as he had, and he would not have collided with Selander.

Washington acknowledged that when he pleaded guilty, he admitted that he was under the influence of methamphetamine and driving a stolen car. He admitted that he willfully failed to stop and drove in a reckless manner while attempting to elude the officers after they tried to stop him with lights and sirens.

3.      Expert testimony

A police procedure consultant testified for Pierce County. He testified that in determining how to respond to Washington's driving, the deputies did not have enough time to "totally assess the unfolding event." Verbatim Rep. of Proc. (VRP) (Feb. 17, 2022) at 41. He explained that a car traveling 70 miles per hour covers about 102 feet per second. And he said the distance between the laundromat parking lot and the intersection where the collision happened was six-tenths of a mile or 3,168 feet. He thus concluded that a car traveling 70 miles per hour would cover that distance in about 30 seconds. The consultant added that it can take up to 30 seconds for a driver to pull over and stop after a pursuing law enforcement officer turns on their car's emergency lights.

A criminologist testified for Selander's estate. He testified that in an urban area, if an officer terminates a pursuit, the average driver slows down within about two blocks. He said that in this case, if the deputies had terminated the pursuit at 92nd or 93rd Street—about two-tenths of a mile, or 1,056 feet, from the intersection—it was more likely than not that the collision would not have happened. But the criminologist also testified that a driver going 70 miles per hour would cover that distance in "seconds." VRP (Feb. 16. 2022) at 183.

An accident reconstruction expert also testified for Selander's estate. He testified that had Washington been driving from the Crossland Motel parking lot to the laundromat parking lot at 55 miles per hour, he would have either lost control of the car when making the turn or overshot. In contrast, the County's police procedure expert testified that he had driven the route himself and that Washington could have successfully made the turn, but there was confusion about what exact route Washington took.

The accident reconstruction expert further testified that because the Honda was a front-wheel drive car, it would not have fishtailed when turning into the parking lot, as the deputies asserted. And he testified that Washington would have been unable to exit the laundromat parking lot at 25 to 35 miles per hour.

B.      Findings of Fact and Conclusions of Law

        1.      The collision

The trial court found that when the deputies first saw Washington driving northbound on Hosmer Street, Washington accelerated to the point of driving "well over" the speed limit of 35 miles per hour. CP at 3018 (Findings of Fact (FF) 12). The deputies turned their car around "to follow and further investigate . . . Washington's traffic law violations." *Id.* (FF 13). As the deputies followed Washington, he "drove into and through" the laundromat parking lot "erratically" and "at excessive speed." *Id.* (FF 18). Washington then drove back onto Hosmer Street. The deputies followed him, and at "[a]bout the time the deputies exited the [laundromat parking lot], they activated their vehicle emergency lights and siren." CP at 3019 (FF 24).

The trial court found that around 92nd Street, the curve in the road where Hosmer Street turns into Steele Street "encumbered the line of sight between the deputies and . . . Washington for

8

a distance of about two to three blocks." *Id.* (FF 31). It found that the intersection of Hosmer Street and 96th Street, toward which the parties were driving, was "known to be a busy four-way intersection." *Id.* (FF 32). The traffic light was "plainly visible" from about 94th Street and "perhaps a little before," and it was visible to Washington as he drove toward the intersection. CP at 3020 (FF 34).

The trial court found that Washington hit Selander "at about 70 miles per hour." *Id.* (FF 41). The trial court also found that a total of about 45 seconds elapsed between the time the deputies activated the police car's emergency lights and the time Washington collided with Selander.

2. The deputies' conduct

The trial court found that when the deputies left the laundromat parking lot, it was reasonable and consistent with their duties to "activate their emergency lights and siren and follow . . . Washington in an attempt to detain him and prevent him from endangering the public due to his speeding and reckless driving." CP at 3021 (FF 52). It thus found that the deputies acted "with reasonable care and drove with due regard for the [safety] of all persons when they initiated their pursuit of . . . Washington." *Id.* (FF 53).

The trial court further found that because the collision happened less than a minute after the deputies turned on their emergency lights, and because the curve in the road impaired their ability to observe Washington, the deputies did not have enough time or information to discern that Washington was likely so determined to avoid apprehension that "he would take absolutely no action" to prevent the collision. *Id.* (FF 54). Even if the deputies had stopped pursuing Washington around 92nd or 93rd Street, it was more probable than not that the result would have been the same. For the result to have been different, Washington would have had to do the

9

following in fewer than 10 seconds: notice that the deputies were no longer pursuing him while the curve in the road made them harder to see; work through "the mental process sufficient to analyze the pertinent facts"; "decide it would be in his best interest to slow down and stop at the red light he was approaching at 70 miles [per] hour"; and "take the physical action necessary to avoid the collision." CP at 3022 (FF 57-58).

Based on its findings, the trial court concluded that given the circumstances—including Washington's initial speeding, his reckless driving, and the pursuit's short duration—the deputies did not breach their statutory duties under RCW 46.61.035. It concluded that Washington was 100 percent liable for Selander's injuries. The trial court thus dismissed the estate's claims against the Pierce County defendants with prejudice. The trial court then conducted a damages phase of the trial with Washington as the only remaining defendant.[3]

Selander's estate appeals the trial court's findings of fact and conclusions of law, as well as the trial court's dismissal of its claims against the Pierce County defendants.

## ANALYSIS

### I. LAW ENFORCEMENT OFFICERS' DUTIES

RCW 46.61.035 grants privileges that expressly allow law enforcement officers to turn, park, or stand in a roadway irrespective of road rules, as well as drive past red lights, ignore stop signs, and exceed speed limits under certain circumstances. RCW 46.61.035(2). But RCW 46.61.035(4) also provides that "the driver of an authorized emergency vehicle" has a "duty to

---

[3] The trial court bifurcated the trial into a liability phase and a damages phase, and the estate included in its notice of appeal the trial court's findings of fact and conclusions of law on damages. However, none of the estate's assignments of error are related to the damages phase.

drive with due regard for the safety of all persons." The statute imposes this duty on law enforcement officers. *Mason v. Bitton*, 85 Wn.2d 321, 325, 534 P.2d 1360 (1975).

A court will find a law enforcement officer acted with due regard when, given the statutory privileges of RCW 46.61.035, the person operating the authorized emergency vehicle "acted as a reasonably careful driver." *Brown v. Spokane County Fire Prot. Dist. No. 1*, 100 Wn.2d 188, 193, 668 P.2d 571 (1983). If an officer pursuing a driver knows that third parties could be injured by the pursued driver, "it is [the officer's] responsibility to determine whether the purpose of the pursuit warrants this risk." *Mason*, 85 Wn.2d at 325-26. An officer's violation of their agency's formal policies regarding pursuit is evidence of a failure to drive with due regard. *See id.* at 327.

## II. CHALLENGED FINDINGS OF FACT

Selander's estate argues that substantial evidence does not support several findings of fact.[4]

---

[4] The Pierce County defendants filed a motion to strike, which asked this court to strike Washington's declaration, any exhibits not admitted in the liability phase of the trial, references to the estate's damages, references to the damages portion of the trial, non-law review articles, and the criminologist's curriculum vitae. Pierce County's Mot. to Strike Suppl. Designation at 2-3 (Sept. 5, 2023). Our commissioner denied the Pierce County defendants' motion to strike. Ruling Den. Mot. to Strike, *Est. of Selander v. Pierce County*, No. 57322-9-II (Wash. Ct. App. Oct. 19, 2023). The Pierce County defendants did not move to modify that decision.

In its opening response brief, Pierce County asked this court to strike portions of the estate's opening brief "that rely on . . . information not before the trial court" in the liability phase. Pierce County Resp't's Opening Br. at 4. We decline to formally strike anything from the estate's brief in the absence of a timely motion to modify the commissioner's ruling on this issue.

Nevertheless, a motion to strike is "typically not necessary to point out evidence and issues a litigant believes this court should not consider." *Engstrom v. Goodman*, 166 Wn. App. 905, 909 n.2, 271 P.3d 959 (2012). "No one at the Court of Appeals goes through the record or the briefs with a stamp or scissors to prevent the judges who are hearing the case from seeing material deemed irrelevant or prejudicial." *Id.* We do not give weight to any evidence that was not before the trial court in the liability phase in which the County defendants were parties. *See Diversified Wood Recycling, Inc. v. Johnson*, 161 Wn. App. 859, 891, 251 P.3d 293 (2011) (denying a motion to supplement the appellate record where the materials were not before the trial court and not

When reviewing a trial court's decision after a bench trial, we determine whether substantial evidence supports the trial court's findings of fact and whether those findings of fact support the trial court's conclusions of law. *Nguyen v. City of Seattle*, 179 Wn. App. 155, 163, 317 P.3d 518 (2014). "The label applied to a finding or conclusion is not determinative; we 'will treat it for what it really is.'" *Id.* (quoting *Para-Med. Leasing, Inc. v. Hangen*, 48 Wn. App. 389, 397, 739 P.2d 717 (1987)).

We presume a trial court's findings of fact are correct, and the party asserting that a finding is erroneous has the burden of showing that substantial evidence does not support the finding. *Id.* "'Substantial evidence' is a quantum of evidence sufficient to persuade a rational and fair-minded person that the premise is true." *Id.* In determining whether the record contains sufficient evidence, we need only consider "evidence favorable to the prevailing party." *Id.* We do not reweigh the evidence, and we defer to the trial court on questions of witness credibility. *Id.* "Unchallenged findings of fact are verities on appeal." *Id.*

A.     Pursuit Initiation

Selander's estate challenges the finding that Washington was driving "well over" the speed limit of 35 miles per hour when the deputies first encountered him. CP at 3018 (FF 12). It challenges the finding that the deputies turned around to "follow and further investigate . . . Washington's traffic law violations." *Id.* (FF 13). And it challenges the finding that Washington drove into the laundromat parking lot "erratically" and "at excessive speed." *Id.* (FF 18).

---

necessary to reach a decision on the merits). However, we may consider any law review articles and give them their appropriate weight.

Substantial evidence supports the trial court's findings on the initiation of the pursuit. Bray testified that Washington was driving roughly 55 miles per hour, despite the speed limit of 35 miles per hour. Driving above the speed limit is a traffic law violation. And in Bray's police report, he wrote that when Washington entered the laundromat parking lot, the Honda's rear end slid "almost sideways," and the tires "screeched" as they "struggled to retain traction with the road." Ex. 1, at 7. Huber testified similarly. While Washington testified that he was initially obeying all traffic laws, that he turned into the parking lot at under 35 miles per hour, and that the Honda did not slide sideways, we do not reweigh conflicting evidence where there is substantial evidence to support the trial court's findings. *See Nguyen*, 179 Wn. App. at 163.

Selander's estate further contends on appeal that it was simply impossible for Washington to be driving 55 miles per hour when he first passed the police officers and still make the turn into the laundromat parking lot. But it acknowledges that his expert reconstructionist addressed whether Washington could have been going 55 miles per hour specifically. In contrast, the officers reported approximate speeds. Moreover, the trial court entered a more general finding that Washington was going "well over" the 35 mile per hour speed limit when the officers first noticed him; the court did not find that he was going 55 miles per hour specifically. CP at 3018 (FF 12). We do not reweigh the evidence on a substantial evidence review. Thus, we reject the estate's challenges to the findings of fact related to the initiation of the pursuit.

B.      Continued Pursuit

The estate challenges the finding that "[a]bout the time the deputies exited the [laundromat] driveway, they activated their vehicle emergency lights and siren." CP at 3019 (FF 24). It also challenges the finding that as the deputies drove southbound on Hosmer Street near the intersection

with 91st or 92nd Street, the "curvature in the road encumbered" their "line of sight . . . for a distance of about two to three blocks." *Id.* (FF 31).

Substantial evidence supports these findings as well. Bray testified that Huber activated the police car's emergency lights either in the laundromat parking lot or as the police car left the parking lot. The trial court's finding is general enough to encompass both possibilities. And for purposes of determining whether the deputies acted negligently, the relevant information is that the deputies activated their emergency lights when Washington accelerated south on Hosmer Street.

Additionally, Huber testified that to see the collision, he had to pass the curve in the road where Hosmer Street turns into Steele Street. A map admitted at trial shows that the curve stretched on for roughly two blocks. The estate argues that Bray's testimony differed, but Bray's testimony further supports the trial court's finding of fact, as he agreed that he "had to be close enough past [the] bend in order to see the collision." VRP (Feb. 15, 2022) at 171-72. Selander's estate does not point to evidence conflicting with any of this testimony or any of these exhibits. Thus, we reject the estate's challenges to these findings of fact.

C.    Collision

The estate challenges the findings that the four-way intersection of Steele Street and 96th Street was known to be busy, and that people driving southbound on Hosmer Street could easily see the traffic light from roughly two blocks away. It challenges the finding that the traffic light was visible to Washington when he approached the intersection. And it challenges the findings that even if the deputies had stopped pursuing Washington around 92nd or 93rd Street, to prevent a collision, Washington—in about 10 seconds—would have needed to notice that the deputies

were no longer pursuing him despite the curve in the road, slow down and stop at the traffic light he was approaching at 70 miles per hour, and "take the physical action necessary to avoid the collision." CP at 3022 (FF 57-58).

Substantial evidence supports the trial court's findings on the collision. Huber and Bray said the intersection is generally busy. They also said they saw the collision when they passed the curve in the road, and based on a map admitted at trial, the curve ends about two blocks from the intersection.

Washington's testimony does not contradict the deputies' testimony: rather, Washington said he did not see the red light because he was focused on watching the deputies in his rearview and sideview mirrors. And the map, combined with the deputies' testimonys, shows that the traffic light at the intersection would have been visible to Washington for about two blocks before the intersection, regardless of whether Washington himself saw it.

Substantial evidence also supports the trial court's findings about the steps Washington would have needed to take to prevent a collision if the deputies had stopped pursuing him at 92nd or 93rd Street. As explained above, the deputies testified that the curve in the road reduced visibility and the map supports this testimony. The estate does not contest the trial court's finding that Washington drove at least 70 miles per hour, so that is a verity on appeal. Moreover, the police procedure consultant testified that a car traveling 70 miles per hour covers about 102 feet per second. The criminologist testified that the distance between 92nd or 93rd Street to the intersection is about 1,056 feet. Thus, Washington would have had about 10 seconds to decide to slow down and take the physical action necessary to avoid colliding with Selander.

We reject the estate's challenges to these findings of fact.

D.      The Deputies' Conduct

Selander's estate challenges the finding that because the collision happened less than a minute after the deputies activated their emergency lights, and because the curve in the road briefly impaired the deputies' ability to observe Washington, the deputies lacked sufficient time or information to discern that in all likelihood, "Washington was so determined to avoid being stopped . . . that he would take absolutely no action to avoid the collision." CP at 3021 (FF 54). And it challenges the finding that even if the deputies had stopped their pursuit at about 92nd or 93rd Street, it is more likely than not that the collision would have happened anyway.

Substantial evidence supports the finding that the deputies did not have enough time to determine how Washington would react to the pursuit. The estate does not challenge the finding that about 45 seconds passed between the deputies activating the police car's emergency lights and Washington colliding with Selander, so this finding is a verity on appeal. Additionally, both Huber and Bray testified that it is difficult to predict whether a police car's emergency lights will cause a driver to pull over or drive faster. Thus, given the fact that Huber and Bray had little time to see how Washington would react, and given the fact that—as explained above—their ability to see Washington was briefly encumbered by the curve in the road, substantial evidence supports this finding.

Finally, substantial evidence supports the finding that even if the deputies had stopped around 92nd or 93rd street, it is more likely than not that Washington would have still crashed into Selander. As explained above, if the deputies had terminated their pursuit at that point, Washington would have had about 10 seconds to realize the deputies were no longer following him, slow down from 70 miles per hour, and take the actions necessary to avoid the collision. Given that the

16

consultant said it can take up to 30 seconds for a driver to stop after an officer turns on their car's emergency lights, it is reasonable to infer that it would have been too late for Washington to similarly correct his course if the deputies had halted their pursuit. We acknowledge that the criminologist testified otherwise. However, to uphold a trial court's finding of fact, we need not conclude that the finding is supported by *uncontroverted* evidence. We need only conclude that it is supported by substantial evidence, and it is.

Substantial evidence supports the challenged findings of fact discussed above.

### III. BREACH OF DUTY

The estate challenges the conclusion that the deputies did not breach their duties under RCW 46.61.035. The estate also challenges two related findings of fact: that the deputies acted reasonably and consistently with their duties when they followed Washington "to detain him and prevent him from endangering the public due to his speeding and reckless driving," and that the deputies acted with "reasonable care and drove with due regard for the [safety] of all persons when they initiated their pursuit." CP at 3021 (FF 52-53). We treat these findings as conclusions of law relevant to the ultimate question of whether the deputies breached their duty of care to Selander.

"We review conclusions of law de novo." *Nguyen*, 179 Wn. App. at 163. But when an appellant challenges a conclusion of law by arguing that the trial court's findings do not support the conclusion, our review is "limited to determining whether the trial court's findings are supported by substantial evidence and, if so, whether those findings support the conclusions of law." *Id.* at 164. Again, we do not reweigh conflicting evidence. *Id.* at 163.

"The elements of a negligence cause of action are the existence of a duty to the plaintiff, breach of the duty, and injury to plaintiff proximately caused by the breach." *Hertog v. City of*

17

*Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). To sustain a negligence action, a plaintiff must prove all of these elements. *Id*.

There is a dearth of case law on a pursuing police officer's duty under RCW 46.61.035 to "drive with due regard for the safety of all persons." RCW 46.61.035(4). The estate cites to *Mason,* but *Mason* provides little guidance because it is both procedurally and factually different from this case. In *Mason*, the Washington Supreme Court addressed whether the trial court properly granted the defendants' summary judgment motion. 85 Wn.2d at 323. Thus, the issue was whether there were genuine issues of material fact regarding the defendants' alleged breach of their duties—not whether findings of fact supported a legal conclusion on breach. *Id.* at 326. And unlike this case, *Mason* involved a lengthy pursuit and multiple law enforcement agencies. *Id.* at 323, 326-27. In the absence of case law applying RCW 46.61.035 to circumstances like ours, we apply the plain language of the statute, recognizing that the officers had a "duty to drive with due regard for the safety of all persons." RCW 46.61.035(4).[5]

Here, the trial court's findings support its conclusion that the deputies did not breach their duty to drive with such due regard under RCW 46.61.035(4). The officers began following Washington for the purpose of protecting other drivers. Shortly after the deputies encountered Washington, he began "driving well over the 35 mile an hour speed limit," and he drove through the laundromat parking lot "erratically" and "at excessive speed." CP at 3018 (FF 12, 18). While the accident reconstruction expert testified that Washington would not have been able to drive

---

[5] We note that Selander's estate discusses RCW 10.116.060 in its briefing. That statute specifically governs law enforcement vehicular pursuits. But Selander's estate also acknowledges that statute was first adopted in 2021, years after both the pursuit at issue in this case and the bench trial. Thus, RCW 10.116.060 could not have established the relevant duty of care at the time of the accident, which occurred in 2017. *See* LAWS OF 2021, ch. 320.

from the Crossland Motel parking lot to the laundromat parking lot at 55 miles per hour or exit the laundromat parking lot at 25 to 30 miles per hour, the trial court did not find that Washington drove at those specific speeds: it only found that Washington had obviously exceeded the speed limit when he drove to the laundromat parking lot and that he drove inside the parking lot at "excessive speed." *Id.* As explained above, substantial evidence supports these findings, and the deputies gave estimates of Washington's speeds rather than exact figures. Additionally, while the accident reconstruction specialist testified that Washington's car would not have fishtailed, the trial court found, more generally, that Washington drove "erratically" and the exact nature of his erratic driving is not relevant to the question of whether it was reasonable for the deputies to follow him. *Id.* (FF 18).

Immediately afterward, Washington drove "at speeds in excess of or at least up to 70 miles per hour." CP at 3019 (FF 27). The deputies' duty to protect other drivers' safety thus became even greater. And between the time Huber activated the police car's emergency lights and the time of the collision, roughly 45 seconds elapsed. The officers thus had less than a minute to evaluate the situation and determine whether the need to stop Washington, who was driving at dangerous speeds, outweighed the risk that their pursuit would lead to a collision. As explained above, substantial evidence supports this finding.

Under these circumstances, the found facts support a conclusion that the officers did not breach their duty to exercise due regard in this very brief period of time. And while the estate contends that the officers' decision to pursue violated departmental policy, it points to no specific rule the deputies violated. The estate encourages us to perform our own analysis of due regard by weighing the risk to the public in pursuing Washington versus the risk in allowing him to continue

driving so recklessly without intervention, considering these specific facts. But we do not reweigh the evidence; we consider only whether the trial court's conclusions were supported by the factual findings. The trial court's findings of fact support its conclusion that the deputies did not violate their duty to "drive with due regard for the safety of all persons." RCW 46.61.035.

The estate also challenges the trial court's conclusion that if law enforcement officers did not attempt to stop drivers dangerously exceeding the speed limit, they would be leaving "scofflaws . . . with a well-found impression that they may drive at any speed they choose." CP at 3023-24 (Conclusion of law 10). The estate argues that this conclusion of law is "a political statement evidencing the trial court's bias on an issue with substantial public controversy." Appellants' Opening Br. at 10. The estate's argument fails because this conclusion is not necessary to support the trial court's verdict in the Pierce County defendants' favor. We need not address this argument further.

The trial court did not err in concluding that the deputies did not breach their duties under RCW 46.61.035. And because breach is an essential element of a negligence claim that the estate failed to prove, the trial court did not err in dismissing the negligence claims against the Pierce County defendants. Finally, while Selander's estate challenges additional findings of fact, we need not address them because they are not relevant to the trial court's conclusion that the deputies did not breach their duty.

## CONCLUSION

We affirm.

20

No. 57322-9-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, P.J.

We concur:

PRICE, J.

CHE, J.